**Case No. 23-5010**

---

In the United States Court of Appeals
for the Tenth Circuit

---

**United States of America,**
Plaintiff-Appellee,

v.

**Raul Hernandez-Moreno,**
Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
The Honorable Billy Roy Wilson, District Judge
D.C. Case No. 4:21-cr-00386-BRW-1

---

**Appellant's Reply Brief**

---

Office of the Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192
Email: Dean_Sanderford@fd.org

Virginia L. Grady
Federal Public Defender

Dean Sanderford
Assistant Federal Public Defender

Attorneys for Appellant
Raul Hernandez-Moreno

October 23, 2023

# Table of Contents

Table of Authorities ................................................................................iii

Argument ..............................................................................................1

    I.   Mr. Moreno does not challenge any testimony elicited on cross-examination, and in any event, defense counsel's questions were proper. ..........................................................................1

    II.  The record refutes the government's alternative interpretations of Detective Ward's testimony on direct examination.................................4

    III. Detective Ward's testimony was plainly – that is, obviously – improper.........................................................................................9

    IV. Detective Ward's improper testimony affected Mr. Moreno's substantial rights and undermines the fairness, integrity, and public reputation of judicial proceedings....................................12

Certificate of Compliance ......................................................................20

# Table of Authorities

## Cases

*Davis v. Alaska*, 415 U.S. 308 (1974) ...........................................................3

*United States v. Benford*, 875 F.3d 1007 (10th Cir. 2017) ............................11, 12, 17

*United States v. Charley*, 189 F.3d 1251 (10th Cir. 1999) ........................................10

*United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014) ........................................10, 18

*United States v. Isabella*, 918 F.3d 816 (10th Cir. 2019) ...........................................3

*United States v. Jones*, 74 F.4th 1065 (10th Cir. 2023) ..................2, 3, 10, 11, 15, 18

*United States v. Koch*, 978 F.3d 719 (10th Cir. 2020) ...............................................10

*United States v. Rosales-Miranda*, 755 F.3d 1253 (10th Cir. 2014)............................10

## Rules

Fed. R. Evid. 608(a) ................................................................................3

## Other Authorities

Robert P. Mosteller et al., 1 *McCormick on Evidence* § 55
    (8th ed. July 2022 update) ....................................................................2

## Argument

Mr. Moreno argued in his opening brief that the district court plainly erred by allowing Detective Ward to effectively testify that he believed Ms. Hughes's account of the robberies and disbelieved Mr. Moreno's. The government makes a slew of arguments in response, but as explained below, none is persuasive.

**I.     Mr. Moreno does not challenge any testimony elicited on cross-examination, and in any event, defense counsel's questions were proper.**

The government first argues (at 22) that appellate review is "foreclosed" with respect to portions of Detective Ward's testimony that defense counsel elicited on cross examination. But Mr. Moreno has not challenged any testimony elicited on cross examination. Rather, all of the testimony he challenges – Detective Ward's testimony that Ms. Hughes's statement gave him "a pretty solid general idea of what actually occurred," that he had "no concerns" that a BB gun was used based on her statements, and that Mr. Moreno was "minimiz[ing] the dangerousness of the situation" by claiming to have used a BB gun – was elicited by the government on direct examination. Vol. 3 at 237, 239-40, 247.

In any event, the questions posed by defense counsel that the government identifies were all proper.

The government first points out (at 23) that defense counsel asked the detective whether he would agree that Ms. Hughes was "less than forthcoming in her testimony today in front of this jury." Vol. 3 at 249. But as the government notes elsewhere (at 27), this Court held in *United States v. Jones* that testimony from an interviewer concerning whether an interviewee was "forthcoming" is not improper because it does "not speak to [the interviewee's] truthfulness" but only to whether they were "willing[] to divulge information." 74 F.4th at 1065, 1071 (10th Cir. 2023). Moreover, defense counsel asked this question only after he had unsuccessfully objected to the government asking Detective Ward whether Ms. Hughes had been forthcoming in her initial interview. Vol. 3 at 218. Defense counsel was entitled to treat the district court's ruling approving testimony about Ms. Hughes's forthcomingness as "the law of the trial and to negatively rebut or explain" the testimony on cross examination without inviting any error. Robert P. Mosteller et al., 1 *McCormick on Evidence* § 55 (8th ed. July 2022 update).

The government next points (at 23-24) to two questions defense counsel asked regarding whether Detective Ward's belief in Ms. Hughes's account was the result of "confirmation bias." But again, there was nothing improper about these questions. The exposure of a witness's potential biases "'is a proper and important function of the constitutionally protected right of cross-examination.'" *United States*

2

*v. Isabella*, 918 F.3d 816, 838 (10th Cir. 2019) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). Further, the fact that defense counsel felt it necessary to ask these questions confirms Mr. Moreno's interpretation of Detective Ward's testimony on direct examination. If, as the government contends, Detective Ward had not effectively testified that he believed Ms. Hughes's account, there would have been no reason for defense counsel to try to discredit his belief in her story.

Finally, the government notes (at 24) that defense counsel asked the detective whether he would agree "that Ms. Hughes is not a reliable or trustworthy person." Vol. 3 at 251. Yet again, this question was appropriate. Although it is improper to ask a witness whether they believe "another witness was truthful or not on a *specific occasion*," Federal Rule of Evidence 608(a) allows testimony concerning another witness's general "*character* for truthfulness or untruthfulness." *Jones*, 74 F.4th at 1069. Moreover, the rule permits "opinion" testimony with respect to "character for truthfulness," which is exactly what defense counsel's question tried to elicit. Fed. R. Evid. 608(a).

## II.     The record refutes the government's alternative interpretations of Detective Ward's testimony on direct examination.

The government's arguments concerning the testimony that Mr. Moreno actually challenges on appeal are unconvincing.

Starting with Detective Ward's testimony that Ms. Hughes's interview gave him "a pretty solid general idea of what actually occurred," the government contends (at 28) that the detective appeared to be "damn[ing] Hughes with faint praise." But the government never explains why this is so, and its characterization defies common sense. As explained in the opening brief (at 14-15), the only plausible interpretation of the detective's testimony is that he generally believed Ms. Hughes's account. Her story would only give him what he thought to be a solid idea of what happened if he believed what she told him. Importantly, Detective Ward didn't say that he believed Ms. Hughes's account because it was corroborated by other evidence. As even the government acknowledges (at 28), at the time of Ms. Hughes's interview, Detective Ward "was still piecing together the facts of the case." Instead, the detective testified that Ms. Hughes's statement itself gave him a good idea of what happened, which could only be true if he believed her. Rather than damning Ms. Hughes with faint praise, Detective Ward was endorsing the truthfulness of her account.

The government also downplays the significance of the detective's testimony that Ms. Hughes gave him a good idea of what happened. Specifically, it claims (at 28-29) that the testimony lacked any "connection" to the truthfulness of Ms. Hughes's claim that they used Mr. Arroliga's gun, and not the BB gun, during the robberies. But this argument entirely ignores the context of the detective's testimony. First, soon after eliciting the detective's opinion about the truthfulness of Ms. Hughes's account, the government returned to the subject and focused squarely on the gun. It asked the detective whether, after speaking with Ms. Hughes, he had "any concerns that the BB gun was used," and the detective answered, "Not based on her statements, no ma'am." Vol. 3 at 247. As explained in the opening brief (at 15-16), this testimony clearly conveyed that Detective Ward believed Ms. Hughes that the BB gun wasn't used during the robberies. Her statement could only leave him with "no concerns" that the BB gun was used if he believed her when she said they used Mr. Arroliga's gun. Tellingly, the government acknowledges the detective's "no concerns" testimony (at 16, 26) but makes no effort to defend it.

More broadly, the government's claim that Detective Ward's belief in the truth of Ms. Hughes's account was not tied to the gun ignores that the identity of the gun used during the robberies was the central issue at trial. As even the

government acknowledges (at 36), Mr. Moreno's defense "centered . . . on the question of which gun was used." And the jury knew this from the beginning. In his opening statement, defense counsel said that much of the evidence was "not going to be disputed," admitted Mr. Moreno's participation in the robberies, told the jurors that the "simple issue" in the case was whether Mr. Moreno "had the intent to cause serious bodily harm or death," and forecast the evidence suggesting the robbers had used "a toy gun." Vol. 3 at 44-46. The jurors therefore knew from the get-go that the identity of the gun was the only significant factual dispute in the case. For that reason, they would naturally understand Detective Ward's testimony that he believed Ms. Hughes's account to mean that he believed her claim that they used Mr. Arroliga's gun, especially after the government zeroed in on that claim by asking if her statement gave him any concerns that the BB gun was used.

Turning to Detective Ward's testimony that Mr. Moreno "tr[ied] to minimize the dangerousness of the situation" by claiming to have used the BB gun, the government argues (at 27-28) that, for three reasons, Detective Ward did not mean he thought Mr. Moreno was lying about the BB gun. None of the government's arguments withstands scrutiny.

First, the government notes that the detective also said Ms. Hughes minimized her involvement during her initial interview. The government doesn't explain why it thinks this fact supports its interpretation, but at any rate, the detective's testimony about Ms. Hughes's attempts to minimize confirms that he used the word to mean lying. Here's the key passage:

Q. What was your impression of what Ms. Hughes had to say?

A. *Partial truths*, which isn't uncommon. You know I think everybody when they're talking to the police they obviously want to make themselves look as good as they possibly can, especially in something like this, *so she kind of tried to minimize her involvement* and – but overall I think she gave me a general – pretty solid general idea of what actually occurred.

Vol. 3 at 239-40 (emphasis added).

The obvious import of Detective Ward's answer is that Ms. Hughes's attempts to minimize amounted to lying. By saying that Ms. Hughes told "partial truths," the detective clearly conveyed that some of what she said was false; otherwise, the "truths" would not be "partial." And in explaining how her statement was only partially truthful, he contrasted her attempts to minimize from the rest of her story, which gave him a "pretty solid general idea of what actually occurred." This clearly communicated to the jury that Ms. Hughes's attempts at minimization were the portions of her story that he deemed to be lies. They were the parts of her account that were false, while the rest of what she said he

7

determined to be truthful. Thus, far from undermining Mr. Moreno's interpretation, this passage confirms that when Detective Ward spoke of the defendants minimizing, he meant that they were lying.

Second, the government contends (at 27) that, in the passage quoted above, Detective Ward made clear that by "minimizing," he meant trying to "make oneself look as good as possible while still admitting wrongdoing." Although the government doesn't spell the argument out, it appears to be suggesting that Detective Ward may have meant that Ms. Hughes gave a truthful account but tried to minimize the situation's gravity. But as explained above, the entirety of his response belies this interpretation because he said that Ms. Hughes gave partial truths, meaning that some of what she said was untruthful. He then elaborated on the point by explaining that she partly minimized her involvement and partly gave him a good idea of what happened. The obvious import of his response, taken as a whole, is that her attempts to minimize were false, but the rest of what she said was true.

Third, and similarly, the government contends (at 28) that Detective Ward may have believed that Mr. Moreno was telling the truth about using the BB gun but was nevertheless trying to minimize how dangerous the situation was. But the record refutes this argument because Detective Ward's testimony left no doubt that

he did not believe the BB gun story. As noted above, the detective testified that he had no concerns that the BB gun was used after hearing Ms. Hughes's account. More generally, the government's theory was that the robbers used Mr. Arroliga's gun, and not the BB gun. There is no way the jury would have thought Detective Ward – the government's primary law enforcement witness – disagreed with the government's theory and believed they had used the BB gun.

Finally, the government argues (at 26-27) that Detective Ward properly testified that Mr. Moreno was not "forthcoming" in his interview. This argument is a sideshow because Mr. Moreno has not argued that this testimony was improper. As noted above, this Court held in *Jones* that testimony as to an interviewee's forthcomingness does not improperly opine on the interviewee's truthfulness because it concerns only whether they were willing to talk. 74 F.4th at 1071. Detective Ward's testimony that Mr. Moreno was not forthcoming is therefore irrelevant to this appeal.

## III.    Detective Ward's testimony was plainly – that is, obviously – improper.

The government also argues that any error was not plain, but most of what it says is not relevant to plainness. In fact, most of its argument consists of a granular analysis of various factual distinctions between this case and two cases in which this Court found plain error based on a witness testifying that they believed another

9

witness's story. Gov't Br. at 29-34 (discussing *Jones* and *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014). This argument misunderstands how plainness analysis works.

An error is plain when it is "obvious under current law," *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014), and plainness is typically established by a showing that either the "Supreme Court or this court [has] addressed the issue," *United States v. Koch*, 978 F.3d 719, 726 (10th Cir. 2020). Here, the governing legal rule is established by this Court's case law, which clearly holds that no witness – lay or expert – may testify to the truthfulness of another witness's story. *Jones*, 74 F.4th at 1069 (lay witnesses); *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) (expert witnesses). Although the government strains (at 21, 26) to portray the restrictions on expert testimony as more stringent than those applicable to lay witnesses, it does not contest that when it comes to opinions about whether a witness was truthful on a specific occasion, the rule is the same – such testimony is flatly prohibited, no matter who the witness is.

*Jones* and *Charley* establish that this rule is plain, regardless of any factual distinctions between this case and this Court's prior cases. *Jones*'s own plainness analysis makes that clear. There, this Court found the offending testimony to be plainly erroneous simply because the text of Rule 608(a) "clearly [spoke] to the

error" by "plainly precluding the use of testimony to vouch for the truth of a witness on a specific occasion." 74 F.4th at 1070. The Court did not analyze the factual differences between Jones's case and prior cases that involved similar errors but instead found plainness based on the clarity of the governing rule. *Id.*

Moreover, most of the factual differences that the government perceives between this case and earlier cases do not relate to the obviousness of the error but to whether the error likely swayed the jury's verdict. For example, the government posits (at 30-32) that this case involved more evidence corroborating the vouched-for witness's testimony than *Jones* did, and that the offending testimony in *Hill* was extensive and carried the imprimatur of expert evidence. These supposed distinctions have nothing to do with the obviousness of the error but go solely to the third-prong question of prejudice – whether there is a "reasonable probability" that the error affected the jury's verdict. *United States v. Benford*, 875 F.3d 1007, 1017 (10th Cir. 2017).

The government's only contention that arguably bears on the plainness of the error is that the witnesses in *Jones* and *Hill* more "directly" opined on the truthfulness of another witness's account than Detective Ward did. But plainness turns on the obviousness of the error, and testimony that obviously comments on the truthfulness of a witness's story plainly violates the rule from *Jones* and *Charley*

11

regardless of how direct it is. As explained above, Detective Ward's testimony that (1) Ms. Hughes's account gave him "a pretty solid general idea of what actually occurred," (2) he had "no concerns" that the BB gun was used after speaking to her, and (3) Mr. Moreno was "trying to minimize the dangerousness of the situation" by claiming to have used a BB gun obviously communicated to the jury that he believed Ms. Hughes's account and disbelieved Mr. Moreno's. The error was therefore plain.

## IV. Detective Ward's improper testimony affected Mr. Moreno's substantial rights and undermines the fairness, integrity, and public reputation of judicial proceedings.

The government makes a number of arguments with respect to prejudice, but before addressing them, it is helpful to recap Mr. Moreno's argument. In a nutshell, Mr. Moreno argues that it is "reasonabl[y] probab[le]" that he was prejudiced by Detective Ward's improper testimony endorsing the truth of Ms. Hughes's account because (1) there was substantial evidence supporting Mr. Moreno's assertion that they used the BB gun, (2) Ms. Hughes was the only witness with firsthand knowledge who testified that they used Mr. Arroliga's gun, and (3) conviction on all five counts likely hinged on whether the jury believed beyond a reasonable doubt that the robbers used Mr. Arroliga's gun and not the BB gun. *Benford*, 875 F.3d at 1017.

In response, the government contends (at 34-35) that the evidence that the robbers used Mr. Arroliga's gun was strong "independent" of Detective Ward's improper testimony. But much of what the government cites derived from Ms. Hughes's testimony, which Detective Ward improperly bolstered. For example, the government relies on Ms. Hughes's testimony that they used Mr. Arroliga's gun and on the evidence that the gun was recovered with a blue bandana matching the description of the bandana that Ms. Hughes claimed to have used during the robbery. This evidence was in no way "independent" of the error because Detective Ward's testimony was improper precisely because it endorsed the truthfulness of Ms. Hughes's story, making it more likely that the jury would believe her despite the myriad reasons to doubt her veracity.

The government cites very little in the way of truly independent evidence, and what it does cite is weak.

First, the government relies on Mr. Espinoza's testimony that the BB gun recovered from his truck was a different color than the gun used against him. But the government ignores that, when shown a photograph of the BB gun, Mr. Espinoza backtracked, testifying that he was unsure whether it was the same weapon and that it had the "same form" as the one used against him. Vol. 3 at 83.

The government also ignores that Mr. Paniagua testified that the gun was either black or dark brown, which could match either weapon. *Id.* at 49, 60.

Second, the government cites Detective Ward's testimony on cross-examination that "the other co-defendant specified that a gun matching this description was used." Vol. 252. But this brief remark apparently passed without notice because it was neither picked up by the government on redirect examination nor mentioned during closing argument. It was also vague and oddly worded. According to Ms. Hughes, the weapon they used was Mr. Arroliga's gun. But according to Detective Ward, Mr. Arroliga did not say that they used his gun but that they used one "matching [the] description" of his gun. To the extent that the jurors focused on this brief comment, they probably struggled to understand what it meant. Without clarifying context, it could have been a denial that they used his gun just as easily as an admission that they did.

Third, the government notes that the BB gun was recovered from Mr. Espinoza's truck among papers and tools that did not belong to him. The government appears to agree that these items, including the BB gun, were left there by the robbers, which supports Mr. Moreno's position that they used the BB gun during the robberies. But according to the government, because the papers and tools were not used during the robberies, the jury could infer that the BB gun

14

wasn't used either. This is not a reasonable inference, much less a compelling one. The government never explains how the papers and tools could possibly have been used during the robberies. The fact that the robbers left the BB gun, a potential instrumentality of the robberies, among items that couldn't have played a role in the robberies says nothing about whether the robbers used the BB gun during the robberies. And the government's juxtaposition of these items with the fact that Mr. Arroliga's gun was found with a blue bandana doesn't meaningfully advance its position because, as noted above, only Ms. Hughes, who Detective Ward improperly bolstered, said she used the bandana during the robberies.

Thus, contrary to the government's view, this case does not appreciably differ from *Jones.* The government's case that the robbers used Mr. Arroliga's gun largely turned on whether the jury believed Ms. Hughes's account beyond a reasonable doubt. And as this Court said in *Jones,* "where the outcome boils down to a believability contest," testimony vouching for the credibility of one side of the story "is often prejudicial." *Jones*, 74 F.4th at 1072. This case is no exception.

The government also tries (at 33) to diminish the importance of Detective Ward's improper opinion testimony, noting that the detective was not presented as an expert witness. This argument elevates form over substance. Although Detective Ward was not technically qualified as an expert, the jury likely believed

15

he had specialized experience worthy of deference. He was portrayed as a trained detective and told the jury he had attended "the Reid school of interrogation." Vol. 3 at 20. He also drew on his background in interviewing suspects by opining that telling partial truths was not "uncommon" in an interrogation setting, suggesting that his training and experience had imbued him with a special ability to separate truth from lies. *Id.* at 239. Regardless of whether he was qualified as an expert, the jury likely regarded him as someone with expertise in discerning whether a person he interrogated told the truth.

The government additionally contends (at 37) that defense counsel diffused the prejudice caused by Detective Ward's improper testimony by cross-examining him on whether his opinions were the result of confirmation bias. But there is no reason to think defense counsel's efforts were at all effective. When defense counsel asked Detective Ward whether he was "more inclined" to believe a story that aligned with his theory of the case, the detective said no. Vol. 3 at 249. And when defense counsel asked what he did to guard against confirmation bias, the detective said, "I just try to identify the facts of the case." *Id.* Given the detective's straightforward denials, it is highly unlikely that defense counsel made any headway with this brief line of questioning.

Finally, the government argues (at 36-37) that whether the robbers used the BB gun or Mr. Arroliga's gun was not "outcome-determinative." As the government concedes, this argument goes only to the carjacking counts; the identity of the gun *was* outcome-determinative as to the firearm counts because a BB gun does not meet the federal definition of "firearm." But the government's argument also fails with respect to the carjacking counts. According to the government, the jury could have found that Mr. Moreno "intended to cause death or serious bodily injury" – a requirement for conviction under the carjacking statute – even if it found that he used a BB gun. But while this is theoretically possible, it is hardly "reasonabl[y] probab[le]." *Benford*, 875 F.3d at 1017.

A BB gun is not the type of weapon one intending to cause death or serious bodily injury would use. One police officer agreed at trial that people give children BB guns as gifts, vol. 3 at 118, and Detective Ward tacitly admitted to participating in "BB gun wars" as a kid, *id.* at 255. Moreover, while the government now asserts that Mr. Moreno could have intended to kill or maim with the BB gun, it never promoted this theory to the jury. Instead, in response to defense counsel's argument that using a BB gun is not indicative of the necessary intent, the government doubled down on its contention that the robbers used Mr. Arroliga's

17

gun, *id.* at 368, never once arguing that they harbored the intent to kill or seriously injure if they used the 4th gun.

Turning to the fourth and final requirement under plain error review, the government simply rehashes its prejudice argument, contending (at 38) that there is "no reasonable probability" that Mr. Moreno would have been acquitted absent Detective Ward's improper testimony. This argument fails for the reasons discussed above. Moreover, as discussed in the opening brief, this Court has already held that prejudicially testifying to one's belief in the truthfulness of another witness's account is "'intolerable under our system of jurisprudence'" and that "'ignoring it would offend core notions of justice and seriously affect the fairness and integrity, and public reputation of judicial proceedings.'" *Jones*, 74 F.4th at 1073 (quoting *Hill*, 749 F.3d at 1267).

This Court should vacate Mr. Moreno's convictions and remand for a new trial.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

By: */s/ Dean Sanderford*
    Dean Sanderford
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, Colorado 80202
    (303) 294-7002
    Email: Dean_Sanderford@fd.org

## Certificate of Compliance

As required by Fed. R. App. P. 32(g)(1), I certify that this brief is proportionally spaced and contains 4,023 words.  I relied on my word processor to obtain the count, and the information is true and correct to the best of my knowledge.


/s/ Dean Sanderford
Dean Sanderford
Assistant Federal Public Defender